# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# GREAT FALLS DIVISION

| | |
|---|---|
| DIANA McCLAMMY, <br><br> Plaintiff, <br><br> vs. <br><br> OFFICER THOMAS HALLORAN, *et al.*, <br><br> Defendants. | CV-18-68-GF-BMM <br><br><br> **ORDER** |

Defendant City of Great Falls ("City") and Defendants Great Falls Police Officers Tovson and Halloran (collectively "Officers") filed separate motions for summary judgment. (Docs. 41 & 45.) Plaintiff Diana McClammy ("McClammy") opposed the motions. (Docs. 78 & 80.) The Court conducted a hearing on the motions on September 12, 2019. (Doc. 100.)

**FACTUAL AND PROCEDURAL BACKGROUND**

McClammy called 911 at approximately 7:32 p.m. on May 22, 2015. (Doc. 3 at 3.) She reported that her boyfriend, Louis Dymon, had physically abused her. (*Id.*) The Officers responded to McClammy's apartment building. (*Id.*) McClammy told the Officers that Dymon had been drinking, was violent, head-butted her, hit

1

her in the back of the neck with a plastic bottle, and scratched her face at her jawline. (*Id.*)

The Officers spoke separately with McClammy and Dymon. (*Id.* at 3-4.) McClammy alleges that the Officers acted dismissively toward her complaints. (*Id.* at 3.) The Officers reported that McClammy was intoxicated. (*Id.*) Subsequent testing measured McClammy's blood alcohol content (BAC) as 0. (*Id.*) The Officers reported that Dymon was calm, but appeared intoxicated. (*Id.* at 4.) Subsequent testing measured Dymon's BAC as 0.297. (*Id.*) The Officers cleared the call based on their conversations with McClammy and Dymon. (*Id.*) McClammy reports that the Officers' investigation lasted less than 15 minutes. (*Id.*) The Officers left the apartment building after they had concluded their investigation. (*Id.*)

The apartment building manager called 911 a little over an hour later. (*Id.*) The building manager reported that McClammy told him that she had just stabbed Dymon and to call for help. (*Id.*) The Officers responded to the scene. (*Id.*) McClammy asserts that she told the Officers that she had acted in self-defense and that she had not meant to kill Dymon. (*Id.*) The Officers arrested McClammy. (*Id.*) Medical personnel pronounced Dymon dead later that night. (*Id.* at 5.)

The State of Montana charged McClammy with deliberate homicide for Dymon's death. (*Id.*) The state district court appointed public defender Matthew

McKittrick to defend McClammy. (*Id.* at 6.) McClammy pleaded not guilty to the charge of deliberate homicide. (*Id.*) The court held an omnibus hearing on October 14, 2015. (*Id.*) McClammy informed the court that she intended to rely on a justifiable use of force and/or mental disease or defect defense. (*Id.*) The court scheduled trial for November 16, 2015. (*Id.*)

McKittrick moved to vacate and continue various deadlines, including McClammy's trial date. (*Id.*) Ultimately, the court reset McClammy's trial for February 13, 2017. (*Id.*) The State filed a motion to dismiss the charge with prejudice on February 7, 2017. (*Id.*) The State represented that it lacked sufficient evidence to overcome McClammy's self-defense claim. (*Id.*) The state district court dismissed the charges on February 7, 2017. (*Id.* at 7.) McClammy had been incarcerated for the 21 months between her arrest and the dismissal. (Doc. 78 at 11-12.)

McClammy filed her Complaint in Montana State Court on March 7, 2018. (Doc. 3 at 15.) McClammy initially asserted seven causes of action against various defendants. (*Id.* at 7-16.) The Officers removed the case to federal court on April 25, 2018. (Doc. 1.) McClammy has since moved to dismiss several causes of action and two defendants. (Docs. 80 at 2, 98 at 1, & 100.) The following causes of action remain: (1) negligence against the Officers and the City; and (2) 42 U.S.C. § 1983 Fourteenth Amendment violation against the Officers. (Doc. 3 at 7, 13.)

3

McClammy clarifies that she bases her claims against the Officers on their alleged "deliberate indifference" in investigating the assault that McClammy first reported and in failing to arrest Dymon based on their investigation. (Doc. 78 at 4.) McClammy bases her claims against the City on its vicarious liability for the Officers' tortious conduct. (*Id.*)

## DISCUSSION

I. **Motions for Summary Judgment**

The Court will address separately the motions for summary judgment.

**A. Summary Judgment Legal Standard**

A party may move for summary judgment on all or part of a claim. Fed. R. Civ. P. 56(a). Summary judgment proves proper when no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The Court will grant summary judgment where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A moving party, who does not carry the burden of proof at trial, carries the "initial burden of production" on a summary judgment motion. *Nissan Fire & Marine Insurance Company, LTD v. Fritz Companies, Inc.*, 210 F.3d 1099, 1102 (2000). The movant may fulfill her initial burden of production in one of two ways. *Id.*, at 1106. The movant may produce "affirmative evidence negating an essential

element of the nonmoving party's claim." *Id.* at 1103. The movant alternatively may show that the "nonmoving party did not have enough evidence to carry" her burden of proof at trial. *Id.*

If the movant meets her burden of production, the nonmovant must produce evidence to support her claim. *Id*. Rule 56 mandates summary judgment where the nonmovant's production of evidence fails to create a genuine issue of material fact. *Id*. If the movant fails to meet her initial burden of production, then the nonmovant may defeat the motion for summary judgment without having produced any evidence. *Id*.

**B. The Officers' Motion for Summary Judgment**

<u>State-Created Danger</u>

The Fourteenth Amendment generally does not require an officer to protect an individual from third-party violence. *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 768 (2005). An officer may owe a Fourteenth Amendment due process duty to protect against third-party violence, however, if the officer affirmatively placed the plaintiff in a position of known danger by acting with deliberate indifference. *Kennedy v. City of Ridgefield*, 439 F.3d 1055, 1062-63 (9th Cir. 2006). The exception requires the officer to engage in affirmative conduct that placed the plaintiff in a position that was more dangerous than the one in which the officer found the plaintiff. *Id.* at 1061.

5

McClammy alleges that the Officers' actions resulted in a state-created danger in violation of her Fourteenth Amendment Due Process right. (Docs. 3 at 13 & 78 at 12.) McClammy asserts that the Officers created a danger through the following omissions: (1) failing to investigate properly her claims when they responded to her 911 call; and (2) failing to arrest Dymon following their investigation. (Doc. 78 at 12.)

McClammy specifically argues that the Officers increased her risk of harm by "stoking Dymon's anger" during their investigation. (*Id.* at 20.) McClammy asserts that, after the Officers left, Dymon threw her on the futon, grabbed her hair, and screamed, "[n]o red marks bitch!" (*Id.*) McClammy contends that the Officers must have told Dymon that they had not seen any red marks on McClammy's head or neck in order for Dymon to then scream "[n]o red marks bitch!" at McClammy after the Officers had left. (Doc. 78 at 20.)

The Officers moved for summary judgment regarding McClammy's state-created danger claim. (Doc. 42 at 13.) The Officers assert that McClammy failed to show that their actions deprived McClammy of any constitutional right. (*Id.*) The Officers argue that they did not act affirmatively to place McClammy in a position that was more dangerous than the one in which they found her. (*Id.* at 16.) The Officers further argue that no evidence exists to indicate that they acted with deliberate indifference to a known or obvious danger. (*Id.*)

6

A genuine issue of material fact exists regarding whether the Officers acted affirmatively with deliberate indifference to place McClammy in a more dangerous position than the one in which they found her. McClammy argues that the Officers acted affirmatively. (Doc. 78 at 20.) McClammy asserts that the Officers' action in telling Dymon that they did not see any red marks on McClammy constitutes the "affirmative act." (Doc. 78 at 20.) McClammy further alleges that the Officers acted with deliberate indifference despite the following compelling evidence presented to the Officers: (1) that Dymon had physically abused McClammy; and (2) that the physical abuse would escalate when the Officers left. (Doc. 78 at 21.)

The parties separately emphasize the genuine issues of material fact that currently exist. McClammy contends that the Officers' purported statement to Dymon that they had not seen any red marks on McClammy constitutes the "affirmative act" at issue. Whether the Officers made that statement to Dymon represents a disputed issue of material fact. (Doc. 88 at 6.) Assuming the Officers made the statement, McClammy's claim of Dymon's reaction to the statement also presents a factual issue.

The trier of fact must determine whether the statement increased Dymon's anger towards McClammy, thereby placing her in more danger than when the Officers first arrived at the scene. The trier of fact first must resolve these material factual issues to determine whether the officers acted with deliberate indifference

when they left the apartment building after having completed their investigation without arresting Dymon. These issues of material fact preclude summary judgment on McClammy's state-created danger claim. Fed. R. Civ. P. 56(c).

State Law Claims

Officers further assert that they are entitled to summary judgment on McClammy's state law claims. (Doc. 42 at 24.) McClammy agrees that the doctrine of qualified immunity protects the Officers from her state law claims because the City appears as a defendant and the Officers acted in the scope of their employment. (Doc. 78 at 23.) The Court grants the Officers' motion for summary judgment regarding McClammy's state law claims.

**C. The City's Motion for Summary Judgment**

The public duty doctrine provides that a police officer owes no duty to an individual plaintiff when carrying out his general duty to protect and preserve the peace. *Renenger v. State*, 426 P.3d 559, 567 (Mont. 2018). The public duty doctrine expresses the policy that a police officer owes to the public at large a duty to protect and preserve the peace rather than to an individual plaintiff. *Nelson v. State*, 195 P.3d 293, 301 (Mont. 2008).

McClammy claims that the Officers acted negligently in the following ways: (1) investigating the assault that she had reported; and (2) failing to arrest Dymon after conducting their investigation. (Doc. 78 at 4.) The City moved for summary

8

judgment on the basis that the City lacks liability for the Officers' alleged negligence. (Doc. 46 at 11.) The City asserts that the Officers owed no legal duty to McClammy based on the public duty doctrine's protection of their conduct. (Doc. 46 at 11-25.) The City asserts that the public duty doctrine bars liability for an alleged negligent investigation. (Doc. 46 at 12.) The City further asserts that the public duty doctrine bars liability for the Officers' alleged negligence in failing to arrest Dymon after having completed their investigation. (Doc. 46 at 19.)

Courts have recognized exceptions to the public duty doctrine where a "special relationship" exists between a police officer and the plaintiff. This "special relationship" gives rise to a duty that proves more specific than the general duty that the officer owes to the public at large. *Gatlin-Johnson v. City of Miles City*, 291 P.3d 1129, 1132 (Mont. 2012); *Nelson*, 195 P.3d at 300. A statute that specifically protects a class of persons establishes this "special relationship." *Gatlin-Johnson*, 291 at 1132. The Montana Supreme Court in *Massee v. Thompson*, 90 P.3d 394, 403-04 (Mont. 2004), determined that Montana's domestic abuse statutes create this "special relationship" between police officers and victims of domestic violence.

The Montana Legislature has enacted numerous statutes that specifically address the relationship between police officers and domestic abuse victims. For example, Mont. Code Ann. § 46-6-311 provides that arrest represents the

9

"preferred response" in domestic assault cases involving "imminent danger to the victim." In fact, Mont. Code Ann. § 46-6-601 affirmatively requires a police officer to file a written report with the officer in command when the officer fails to make an arrest when called to the scene of a reported domestic assault incident. Mont. Code Ann. § 46-6-602 further requires a police officer to advise the victim of the availability of a shelter or other community services and notify the victim of any legal rights and remedies available.

The statutes could be construed, pursuant to *Massee*, to reflect the Montana Legislature's intent to create a "special relationship" between law enforcement and victims of domestic violence. *Massee*, 90 P.3d at 403-04. McClammy called 911 and reported that Dymon, her domestic partner, had assaulted her. The 911 operators dispatched the Officers to McClammy's apartment. McClammy alleges that the Officers had a "special relationship" with McClammy, a victim of reported domestic violence, pursuant to Montana law.

Montana law obligated the Officers to respond to the reported domestic violence in a specific manner. *See* Mont. Code Ann. §§ 46-6-311, 46-6-601, 46-6-602. McClammy alleges that the Officers owed McClammy a legal duty pursuant to those statutory obligations. McClammy further alleges facts that could limit application of the public duty doctrine to the Officers' potential liability. The City's motion for summary judgment (Doc. 45) must be denied until the finder of

fact resolves the extent of the contact—and the corresponding relationship—between McClammy and the Officers.

## II. Motions in Limine

### A. Motion in Limine Legal Standard

A motion in limine constitutes "a procedural mechanism to limit in advance testimony or evidence in a particular area. *Frost v. BNSF Ry. Co.*, 218 F. Supp. 3d 1122, 1133 (D. Mont. 2016). A motion in limine "reduces the likelihood that unduly prejudicial evidence will ever reach the jury." *Jackson v. Cty. Of San Bernardino*, 194 F. Supp. 3d 1004, 1008 (C.D. Cal. 2016) (*citing Brodit v. Cambra*, 350 F.3d 985, 1004-05 (9th Cir. 2003). A district court possesses "wide discretion" in considering a motion in limine. *Frost*, 218 F. Supp. 3d at 1133.

### B. The Parties' Motions in Limine

McClammy, the Officers, and the City have filed several motions in limine asking the Court to exclude multiple items of evidence at trial. (Docs. 49, 55, 58, 60, & 63.)

McClammy seeks to exclude the following evidence: (1) evidence of other crimes, wrongs, or bad acts (Doc. 50 at 6-21); (2) defense counsel's questioning of McClammy regarding whether other witnesses are lying (Doc. 50 at 21-29); and (3) Defense expert Mark Muir's rebuttal testimony (Doc. 50 at 29). (Docs. 49 & 50.)

The Officers seek to exclude the following evidence: (1) McClammy's liability experts' testimony (Docs. 55 & 57); (2) testimony concerning Missoula Police Department policies (Docs. 58 at 2 & 59 at 2); and (3) reference to any alleged need for an "internal investigation" (Docs. 58 at 2 & 59 at 3). (Docs. 55, 57, 58 & 59.)

The City seeks to exclude the following evidence: (1) references to current events, racial strife, news sources, political figures, and political affiliations (Docs. 60 at 2 & 61 at 5-7); (2) McClammy's handwritten statement (Docs. 60 at 2 & 61 at 7-9); and (3) McClammy's expert Mori Woods's testimony (Docs. 62 at 1-2 & 63 at 2-10).

**C. The Court's Rulings**

The Court heard arguments on the motions in limine at the hearing on September 12, 2019. (Doc. 100.) The Court ruled from the bench on the parties' motions during the hearing and provided its reasoning at that time. The Court summarizes its decisions as follows:

1. <u>Evidence of McClammy's prior bad acts</u>: Evidence of McClammy's prior bad acts will be admissible only if McClammy first opens the door to such evidence at trial. Defendants must submit a list to the Court of each bad act that Defendants seek to admit. The list must detail the prior bad act, including a description of the act, where the act occurred, and when the act occurred. The

Court will rule on the admissibility of each prior bad act individually when it becomes necessary to do so.

2. <u>Defense counsel's questioning of McClammy regarding whether other witnesses are lying</u>: Defendants must compile a list of witnesses whom McClammy claims to be lying. Defendants should identify those witnesses' specific statements that McClammy contradicted during her deposition. Any of these witnesses must testify at trial in order for Defendants to question McClammy on any alleged lies by the testifying witnesses. The Court will rule on each testifying witness closer to trial as appropriate.

3. <u>Defense expert Mark Muir's rebuttal testimony</u>: Any new information that Muir presented on rebuttal must have been in response to information that Plaintiff's experts disclosed. Any other information will be excluded.

4. <u>Mark Muir's references to current events, racial strife, news sources, political figures, and political affiliations</u>: Plaintiffs may question Muir about any opinions that Muir published in a widely read publication, such as a newspaper. Plaintiffs must seek the Court's approval to question Muir about opinions that he published in a more private publication, such as on his Facebook account. Plaintiffs may not question Muir about any personal opinions that he did not publish unless Muir first opens the door to any such questions.

13

5. <u>McClammy's experts' testimony</u>: Expert witnesses should not use any language that sounds like jury instructions and invades the province of the jury. For example, expert witnesses may testify about matters that they believe to be "credible" or "not credible." Expert witnesses may not say that they believe something to be "false."

    a. <u>Ron Steffens</u>: Plaintiffs may ask Steffens about his investigation. Steffens may discuss the opinions that he formed as a result of his investigation. Steffens may not discuss his opinions in the form of legal conclusions on the ultimate issues to be resolved at trial.

    b. <u>Mori Woods</u>: Woods may not testify regarding her opinions in the form of legal conclusions on the ultimate issues to be resolved at trial, such as her opinion that the officers "deliberately conspired." Defendants may attack Woods's credibility and knowledge as an expert on cross-examination.

6. <u>Testimony concerning Missoula Police Department Policies</u>: Experts may not discuss the City of Missoula's policies, or for that matter, the policies of any particular city. Experts instead should talk generally about "best police practices."

7. <u>Reference to any alleged need for an "internal investigation"</u>: Witnesses may not use the term "internal investigation." Witnesses may discuss the topic by talking about for the need for a "review by supervisors" or by using other appropriate language.

8. <u>McClammy's handwritten statement</u>: The statement is not admissible at this point. The Court will re-assess the issue on redirect examination if necessary.

## ORDER

Accordingly, **IT IS ORDERED** that:

1. Defendant Officers' Motion for Summary Judgment (Doc. 41) is **GRANTED, IN PART,** and **DENIED, IN PART**.

2. Defendant City of Great Falls's Motion for Summary Judgment (Doc. 45) is **DENIED**.

3. McClammy's Motion in Limine (Doc. 49) is **GRANTED, IN PART,** and **DENIED, IN PART**.

4. Defendant Officers' Motions in Limine (Docs. 55 & 58) are **GRANTED, IN PART,** and **DENIED, IN PART**.

5. Defendant City of Great Falls's Motions in Limine (Docs. 60 & 62) are **GRANTED, IN PART,** and **DENIED, IN PART**.

DATED this 25th day of September, 2019.

Brian Morris
United States District Court Judge